FILED
JUL 1 9 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HARRIS THERMAL TRANSFER PRODUCTS,
INC.,

        Plaintiff,

                                        CV 09-718-PK

                                        OPINION AND
v.                                       ORDER

JAMES RIVER INSURANCE COMPANY,

        Defendant.

PAPAK, Magistrate Judge:

        Plaintiff Harris Thermal Transfer Products, Inc. ("Harris"), filed this action against its

insurers James River Insurance Company ("James River") and James River Group, Inc., on June

23, 2009, alleging breach of contract and seeking declaratory judgment in connection with the

insurers' failure to undertake Harris' defense in a manufacturing defect claim against it. On July

16, 2009, Harris amended its complaint, dismissing James River Group as a defendant and

Page 1 - OPINION AND ORDER

adding Transcontinental Insurance Company ("Transcontinental") as a defendant.  On August 27,

2009, Transcontinental filed a counterclaim against Harris for declaratory judgment.  Harris

amended its complaint a second time on February 17, 2010, and on March 1, 2010,

Transcontinental filed an amended answer, again stating its counterclaim for declaratory

judgment.  On April 22, 2010, in response to the parties' joint motion, the court dismissed the

claims against Transcontinental without prejudice.  This court has jurisdiction over this action

pursuant to 28 U.S.C. § 1332, based on the amount in controversy and the complete diversity of

the parties.

Now before the court are Harris' motion (#27) for summary judgment and James River's

motion (#37) for summary judgment.  I have considered the motions, oral argument on behalf of

the parties, and all of the pleadings on file.  For the reasons set forth below, Harris' motion is

denied and James River's motion is granted.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is not proper if material factual issues

exist for trial.  *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

1995), *cert. denied,* 116 S.Ct. 1261 (1996).  The substantive law governing a claim or defense

determines whether a fact is material.  *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d

365, 369 (9th Cir. 1998).

Page 2 - OPINION AND ORDER

In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other. *See* Fed. R. Civ. P. 56; *see also, e.g., Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). A court may not grant summary judgment where the court finds unresolved issues of material fact, even where the parties allege the absence of any material disputed facts. *See id.*

## FACTUAL BACKGROUND

### I.     Parties

Harris is an Oregon corporation headquartered in Newberg, Oregon, that manufacturers heat exchangers as well as other equipment for use in heavy industry, among other applications. James River is an insurance provider headquartered in Richmond, Virginia. James River operates in all fifty states.

### II.    Policy

Pursuant to James River's insurance policy numbered 00003109-4 (the "Policy"), James River agreed to provide insurance coverage to Harris with an effective period of February 9, 2008, through February 9, 2009. *See* Policy, Declarations, Item 2.

#### A.     Coverage

The insurance provided under the Policy covers damages and other expenses incurred as a

result of covered legal claims brought against Harris. *See* Policy, Section I(1)(a). The Policy expressly provides that James River shall have the duty to undertake Harris' defense in connection with such claims. *See* Policy, Section I(1)(b). The Policy likewise expressly provides that "[w]here there is no coverage under th[e] [P]olicy, there is no duty to defend." Policy, Combined General Endorsement, Section 3; *see also* Policy, Section I(1)(b) ("[James River] will have no duty to defend [Harris] against any 'Claim' seeking 'Damages' to which this insurance does not apply").

The Policy defines "Claim" for coverage purposes as "a written demand for monetary damages arising out of or resulting from the performing [*sic*] or failure to perform 'Professional Services.'"[1] Policy, Section II(B). The Policy provides for coverage in connection with "Claims" that are "first made against [Harris] and reported to [James River] in writing during the [effective period of the Policy] by reason of a 'Wrongful Act' in the performance of or failure to perform 'Professional Services' by [Harris]" where the "Wrongful Act" occurred not earlier than February 9, 2004, and not later than February 9, 2009.[2] Policy, Section I(1)(a); *see also* Policy, Declarations, Items 2 and 5. In addition, in large and bolded font and all capitalized letters on the first page of the Policy, the Policy provides as follows:

**THIS POLICY IS WRITTEN ON A CLAIMS-MADE AND REPORTED**

---

[1] The Policy defines "Professional Services" as "those services [Harris] [is] legally qualified to perform for others, for projects including construction, erection, fabrication, installation, assembly, manufacture, or the supply of equipment or materials incorporated therein, in your capacity as an architect, engineer, construction manager, or planner." Policy, Section II(I).

[2] The Policy defines "Wrongful Act" to mean "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty in the performing of or failure to perform 'Professional Services.'" Policy, Section II(O).

> **BASIS AND PROVIDES PROFESSIONAL LIABILITY COVERAGE FOR THOSE CLAIMS THAT OCCUR SUBSEQUENT TO THE RETROACTIVE DATE STATED IN THE DECLARATIONS AND WHICH ARE FIRST MADE AGAINST YOU AND REPORTED TO US WHILE THIS POLICY IS IN FORCE.**

Policy at 1 (emphasis original).  A similar bolded and capitalized warning is provided within the first enumerated item of the "Declarations" section of the policy:

> **THIS POLICY PROVIDES CLAIMS-MADE COVERAGE.  CLAIMS MUST FIRST BE MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND MUST BE REPORTED IN WRITING TO [JAMES RIVER] DURING THE POLICY PERIOD . . . .**

Policy, Declarations, Item 1 (emphasis original).

### B.    Relevant Coverage Exclusions

The Policy expressly excludes from coverage, *inter alia*, any claims directly or indirectly arising out of any "'Professional Service' rendered prior to the effective date of the Policy if [Harris] knew or could have reasonably foreseen that the 'Professional Service' could give rise to a 'Claim'" (the "Section III(a)(1) exclusion").  Policy, Section II(a)(1).

The Policy further expressly excludes from coverage, *inter alia*, any claims directly or indirectly arising out of or resulting from "the design or manufacture of any goods or products which are sold or supplied by [Harris]" (the "Section III(j) exclusion").  Policy, Section III(j).

Finally, the Policy further expressly excludes from coverage, *inter alia*, any claims directly or indirectly arising out of or resulting from "any faulty workmanship, construction or work not in accordance with the design of the product or the construction documents (including but not limited to the drawings and specifications) if such work is performed by [Harris]" (the "Section III(8) exclusion").  Policy, Design/Build Endorsement - Architects and Engineers,

Page 5 - OPINION AND ORDER

Section III(8).

## III.    Underlying Claim Against Harris

On April 18, 2006, the Delta-T Corporation and Harris entered into a contract with an effective date of December 13, 2005, pursuant to which Harris agreed to design, manufacture, and sell to Delta-T 19 heat exchangers, with related equipment and documentation. *See* Complaint filed May 18, 2009, in the United States District Court for the Eastern District of Virginia in Case No. 3:09-CV-321 ("Delta-T's Complaint"), ¶ 8; First Amended Answer filed January 18, 2010, in the United States District Court for the District of Oregon in Case No. CV-09-1056 ("Delta-T's Counterclaims"), ¶ 30. Harris failed to complete performance on its obligations under the contract by the agreed "substantial completion date" of September 29, 2006. *See* Delta-T's Complaint, ¶¶ 10, 12; Delta-T's Counterclaims, ¶¶ 32, 34. In consequence of this failure, "several" of the contract-for heat exchangers "were defective and failed to meet the operating conditions and specifications of the [contract]." Delta-T's Complaint, ¶ 13; Delta-T's Counterclaims, ¶ 35. Delta-T worked "to correct the manufacturing defects" in Harris' installation over a period of months. *See* Delta-T's Complaint, ¶¶ 15, 16; Delta-T's Counterclaims, ¶¶ 46, 47.

On May 18, 2007, Delta-T "notified Harris . . . of the manufacturing defects" in its installation. Delta-T's Complaint, ¶ 14; Delta-T's Counterclaims, ¶ 45.

In a letter dated July 25, 2007, Delta-T notified Harris that the exchangers it had provided "failed to meet the operating conditions as called out in the drawings and specifications required for the Project and as ordered by [Delta-T]," and that as a result of Harris' "fabrication error" Delta-T had "suffered extensive actual and consequential damages," a "three month work

Page 6 - OPINION AND ORDER

extension to the project schedule," and "numerous delays and damages to [Delta-T]." First

Amended Complaint filed November 16, 2009, in the United States District Court for the District

of Oregon in Case No. CV-09-1056 ("Harris' Underlying Complaint"), Exh. B (Delta-T's "July

2007 letter"). In the July 27 letter, Delta-T put Harris "on notice" of applicable warranty

provisions providing that Harris would indemnify Delta-T for financial loss caused by failure of

the equipment to "operate per the specifications." *Id.* In addition, Delta-T indicated its

expectation that Harris would "promptly pay for the remedial work" required to make the

installation "conform to the required operating conditions." *Id.* Delta-T expressly "reserve[d] all

further rights as to any and all damage claims due to [Harris'] misfabrication" and stated that it

"may hold [Harris] liable for failure to deliver conforming Goods to [Delta-T]." *Id.*

On August 2, 2007, Harris wrote a letter to Delta-T, acknowledging its "fabrication error"

and agreeing to "reimburse Delta-T for reasonable costs" incurred in installing "the balance of

nozzle 'P' in the E-4503 Evaporator located in Riga, Michigan." Harris' Underlying Complaint,

Exh. C (Harris' "August 2007 letter").

On February 9, 2008, Harris and James River entered into the Policy, providing insurance

coverage for claims first made against Harris and reported to James River between February 9,

2008, and February 9, 2009, as discussed above. On October 23, 2008, during the effective

period of the Policy, Harris notified James River of Delta-T's claim against it.

On May 18, 2009, Delta-T filed an action against Harris in Virginia, arising out of the

manufacturing defects in the heat exchangers Harris manufactured and sold to Delta-T under the

contract. *See* Delta-T's Complaint. Harris promptly tendered the complaint to James River,

which promptly refused to undertake Harris' defense. That action was subsequently dismissed

Page 7 - OPINION AND ORDER

for lack of personal jurisdiction over Harris in Virginia, without involvement by James River.

Apparently in an effort to control the venue in which the claim would ultimately be resolved, Harris filed a declaratory judgment action against Delta-T in the District of Oregon, attaching as exhibits to its first amended complaint on November 16, 2009, both Delta-T's July 2007 letter and Harris' August 2007 letter. *See* Harris' Underlying Complaint.

On January 18, 2010, Delta-T filed an answer and amended counterclaim in Harris' declaratory judgment action, alleging damages arising out of the manufacturing defects in Harris' installation. *See* Delta-T's Counterclaims. All of Delta-T's damages alleged in that action allegedly arise out of the manufacturing defects in the heat exchangers it received from Harris that were the subject of both its May 18, 2007, communication to Harris and its July 2007 letter. *See id.*; *see also* Delta-T's July 2007 letter. Harris promptly tendered Delta-T's counterclaims to James River, which again refused to undertake Harris' defense.

## ANALYSIS

This court, sitting in diversity, must apply Oregon's conflict-of-laws rules to determine which jurisdiction's law governs the dispute before it. *See, e.g., Alaska Airlines, Inc. v. United Airlines, Inc.*, 902 F.2d 1400, 1402 (9th Cir. 1990), *citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under applicable Oregon law, the Oregon courts look to "the place where the injury occurred, the place where the conduct occurred, the domicile, nationality, place of incorporation and place of business of the parties, and the place where the relationship between the parties is centered" to determine the jurisdiction whose law should be applied. *See Western Energy, Inc. v. Georgia-Pacific Corp.*, 55 Or. App. 138, 145-146 (Or. Ct. App. 1981). Here, the insured is located in Oregon, the insurance contract was entered into in Oregon, and the

risk of a claim being brought against the insured is centered in Oregon, from which I conclude

that the Oregon courts would apply Oregon law to the parties' dispute.[3]  When applying Oregon

law, this court is bound by the decisions of the Oregon Supreme Court, and where no such

decision is available, must "predict how the highest state court would decide the issue using

intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and

restatements as guidance." *S.D. Myers, Inc. v. City & County of San Francisco*, 253 F.3d 461,

473 (9th Cir. 2001), *quoting Strother v. S. Cal. Permanente Med. Group*, 79 F.3d 859, 865 (9th

Cir. 1996).

     In Oregon, the first rule of contract construction is to "ascertain the intention of the

parties" through analysis of the provisions of the contract. *Hoffman Constr. Co. v. Fred S. James*

*& Co.,* 313 Or. 464, 469 (1992), *quoting Totten v. New York Life Ins. Co.*, 298 Or. 765, 770

(1985); *see also* Or. Rev. Stat. § 742.016.  When the parties assert competing plausible

interpretations of a term in the policy, the court must engage in a series of analytical steps. *See*

*id.*, at 470.  If the policy does not define the phrase in question, the court must consider whether

the phrase has a plain meaning. *See Holloway v. Republic Indemnity Co. of Am.*, 341 Or. 642,

649 (2006).  If, however, the phrase in question has more than one plausible interpretation, the

court must then determine whether both interpretations remain reasonable in light of the phrase's

particular context and the broader context of the policy as a whole. *See id.*, at 333-334.  If that

contextual analysis yields two or more reasonable interpretations, then the court should construe

the remaining ambiguity against the drafter. *See id.*, at 334.

     Where the terms of an insurance policy are unambiguous, the contract should be enforced

---

[3] Neither party argues for the application of any different jurisdiction's law.

according to its terms. *See Garrett v. State Farm Mutual Ins. Co.*, 112 Or. App. 539, 543-544 (Or. Ct. App. 1992). The courts will not apply a strained meaning to unambiguous language to create an ambiguity where none exists. *See Mortgage Bancorporation v. New Hampshire Ins. Co.*, 67 Or. App. 261, 264 (Or. Ct. App. 1984). In particular, the courts may not find coverage where the unambiguous terms of a contract exclude coverage. *See Allstate Ins. Co. v. State Farm Mutual Auto. Ins. Co.*, 67 Or. App. 623, 627 (Or. Ct. App. 1984).

An insurer's "duty to defend arises whenever the allegations of a complaint filed against the insured show that there is a possibility that the policy provides coverage for the claim made." *Delta Sand & Gravel Co. v. General Ins. Co.*, 111 Or. App. 347, 350 (Or. Ct. App. 1992), *citing Ferguson v. Birmingham Fire Ins.*, 254 Or. 496, 507 (1969); *see also Ledford v. Gutoski*, 319 Or. 397, 400 (1994) ("The insurer has a duty to defend if the complaint provides *any basis* for which the insurer provides coverage") (emphasis original), *citing Nielsen v. St. Paul Companies*, 283 Or. 277, 280 (1978). Oregon law provides that the duty to defend is determined strictly in accordance with the so-called eight-corners rule, pursuant to which only two documents -- the complaint against the insured and the insurance policy – may be considered in determining whether the insurer has a duty to defend. *See Ledford*, 319 Or. at 399. Under the eight-corners rule, where the facts alleged in the complaint against the insured could, if proven, fall within the coverage provided by the insurance policy, the insurer is under a duty to defend, regardless of whether information extrinsic to the complaint could establish that the claim against the insured is not covered. *See id.* at 400, *quoting Isenhart v. General Casualty Co.*, 233 Or. 49, 54 (1962).

However, it does not appear that the Oregon courts have ever had occasion to consider whether the eight-corners rule may properly be applied in its broadest form to the relatively new

Page 10 - OPINION AND ORDER

phenomenon of "claims-made" policies.  By contrast with "occurrence-based" policies of

professional liability insurance, which provide coverage in connection with claims made against

an insured that arise out of events taking place within the effective period of the policy,

regardless of when the claimant first notifies the insured of its intent to seek damages against the

insured, claims-made policies specifically and expressly provide coverage only in connection

with claims first made against the insured during the effective period, largely without regard to

when the events giving rise to the claims took place.  That is, in connection with claims-made

policies but not in connection with the more familiar occurrence-based policies, the date a

claimant advises the insured that a claim is being made is material to determining whether there

is coverage for the claim.

     The First Circuit has had occasion to summarize the policy considerations underlying the

eight-corners rule in connection with occurrence-based versus claims-made policies as follows:

> Grounded in policy considerations, the so-called "eight corners rule" is
> appropriately invoked in the context of occurrence policies because the complaint
> in describing the incident will usually provide adequate information to determine
> whether--at least as alleged--the incident is within the scope of the insurance
> policy. . . . **However, the rule cannot be rigidly applied in the context of
> claims-made policies where the determinative event is the timing of the claim,
> a fact that likely will be--and in this case was--irrelevant to the merits of the
> underlying tort suit, and therefore absent from the pleadings.**

*Edwards v. Lexington Ins. Co.*, 507 F.3d 35, 40-41 (1st Cir. 2007) (emphasis supplied; citations

omitted).  The *Edwards* court concluded that, under Maine law, a court may properly consider

extrinsic evidence as to the time notice of a claim was given to an insured for purposes of

analyzing the duty to defend in connection with claims-made policies. *See id.* at 41.

     I find the *Edwards* court's reasoning persuasive.  To bar extrinsic evidence of the date a

claim was noticed to an insured when analyzing an insurer's duty to defend under a claims-made

policy would improperly subvert the purpose and terms of the agreement between the insured and

its claims-made insurer by requiring the insurer to undertake the insured's defense under

circumstances where it did not agree to do so and where the insured had no contractual right to

expect it.  Moreover, rigid application of the broadest formulation of the eight-corners rule to

claims-made policies would create circumstances in which the party alleging claims against the

insured could, by choosing whether or not to allege the date a claim was first made against the

insured, control whether the claims-made insurer would be required to undertake its insured's

defense.  Because Oregon acknowledges that "[t]he primary and governing rule of the

construction of insurance contracts is to ascertain the intention of the parties," *Totten*, 298 Or. at

770, and because rigid application of the eight-corners rule would systematically subvert

intentions of the parties to a claims-made insurance contract and distort the terms of their

agreement, I conclude that, if presented with the issue, the Oregon Supreme Court would not

apply the eight-corners rule to bar consideration of extrinsic evidence of the date a claim was

noticed to an insured when analyzing an insurer's duty to defend under a claims-made policy.

*See, e.g.*, *Or. Schs. Activities Ass'n v. Nat'l Union Fire Ins. Co.*, 279 Fed. Appx. 494, 495-496

(9th Cir. 2008) (predicting, in the absence of Oregon case law on the issue, that Oregon would

not apply its so-called "notice-prejudice" rule to claims-made policies on the basis of differential

application of underlying policy considerations to claims-made and occurrence-based

commercial liability policies) (unpublished disposition).

I.      **Coverage for Delta-T's Claim Under Section I(1)(a)**

        The first question for determination by the court is whether Delta-T's claims for damages

against Harris could be within the scope of coverage under the Policy in the absence of any express coverage exclusion.  It is undisputed that Delta-T's claims for damages fall within the Policy definition of "Claim," in that they constitute a demand in writing for money damages arising out of errors in Harris' provision to Delta-T of services that it is legally qualified to perform for others.  *See* Policy, Section II(B), (I), and (O).  It is further undisputed that Harris reported Delta-T's claims against it to James River within the effective period of the Policy and that Harris provided the services in question to Delta-T between February 9, 2004, and February 9, 2009.  The critical issue, therefore, is whether Delta-T's claims were "first made" against Harris between February 9, 2008, and February 9, 2009.  *See* Policy, Section I(1)(a).

It appears from Delta-T's allegations that it first "notified Harris . . . of the manufacturing defects" in its installation on May 18, 2007.  Delta-T's Complaint, ¶ 14; Delta-T's Counterclaims, ¶ 45.  However, there being no indication either that Delta-T's May 2007 communication to Harris was in writing or that the notification included any demand for money damages, the May 2007 communication was not a "Claim" for Policy purposes.

Similarly, Delta-T's July 2007 letter, while in writing, did not contain any "demand" for money damages, but rather expressed Delta-T's "expect[ation]" that Harris would "promptly pay" for Delta-T's remedial work, and "reserve[d] all further rights as to any and all damage claims due to [Harris'] misfabrication. . . ."  July 27 letter.  The July 27 letter was therefore also not a "Claim" for Policy purposes.  I therefore conclude that  Delta-T's "Claim" against Harris was "first made" during the effective period of the Policy.  Absent any applicable coverage exclusion, then, Harris would be entitled to insurance coverage in connection with Delta-T's claims, *see* Policy, Section I(1)(a), and James River would be obliged to undertake its defense, *see* Policy,

Page 13 - OPINION AND ORDER

Section I(1)(b).

## II.    The Section III(a)(1) Exclusion

Under the plain language of the Section III(a)(1) exclusion, the Policy provides no

coverage for claims arising out of Harris' provision of professional services prior to February 9,

2008, "if [Harris] knew or could have reasonably foreseen that the 'Professional Service' could

give rise to a 'Claim.'"  Policy, Section II(a)(1).

Delta-T's July 2007 letter to Harris notified Harris that the exchangers it had provided

"failed to meet the operating conditions as called out in the drawings and specifications required

for the Project and as ordered by [Delta-T]," and that as a result of Harris' "fabrication error"

Delta-T had "suffered extensive actual and consequential damages," a "three month work

extension to the project schedule," and "numerous delays and damages to [Delta-T]."  July 2007

letter.  Through the July 27 letter, Delta-T put Harris "on notice" of applicable warranty

provisions providing that Harris would indemnify Delta-T for financial loss caused by failure of

the equipment to "operate per the specifications."  *Id.*  In addition, Delta-T indicated its

expectation that Harris would "promptly pay for the remedial work" required to make the

installation "conform to the required operating conditions," expressly "reserve[d] all further

rights as to any and all damage claims due to [Harris'] misfabrication," and stated that it "may

hold [Harris] liable for failure to deliver conforming Goods to [Delta-T]."  *Id.*

A person of no more than ordinary prudence could reasonably have foreseen from the

July 2007 letter that the defects in Harris' installation could give rise to a demand for money

damages, not least because the July 2007 letter expressly stated that Delta-T might seek to hold

Harris liable for Delta-T's damages.  *See id.*  Because Harris both provided its services to Delta-T

Page 14 - OPINION AND ORDER

and received the July 2007 letter prior to the effective period of the Policy, the Section III(a)(1) exclusion operates to exclude Delta-T's claims against Harris from coverage under the Policy. *See* Policy, Section II(a)(1).

Even on the *arguendo* assumption that the Oregon courts would exclude from the duty to defend analysis the exhibits attached to Harris' Underlying Complaint filed in connection with its dispute with Delta-T, however, Delta-T's allegations against Harris are sufficient without more to establish the applicability of the Section III(a)(1) exclusion. All of the damages Delta-T seeks against Harris arise out of the alleged manufacturing defects in Harris' installation. *See* Delta-T's Complaint; Delta-T's Counterclaims. Delta-T "notified Harris . . . of the manufacturing defects" in its installation on May 18, 2007, prior to the effective period of the Policy. A person of ordinary prudence could reasonably foresee that manufacturing defects in a large-scale industrial installation could give rise to a demand for damages. Even excluding the July 2007 letter from consideration, therefore, Delta-T's claims are within the scope of the Section III(a)(1) exclusion. *See* Policy, Section II(a)(1).

Because the Policy provides no coverage in connection with Delta-T's claims against Harris, James River is under no obligation to undertake Harris' defense. *See* Policy, Section I(1)(b); Policy, Combined General Endorsement, Section 3.

## III.    The Section III(j) Exclusion and Section III(8) Exclusion

As an alternative basis for concluding that James River is under no obligation to undertake Harris' defense, I further find that coverage of Delta-T's claims is excluded under the Section III(j) exclusion and the Section III(8) exclusion. Under these exclusions, coverage is expressly excluded for any claims directly or indirectly arising out of or resulting from "the

Page 15 - OPINION AND ORDER

design or manufacture of any goods or products which are sold or supplied by [Harris]," Policy, Section III(j), and "any faulty workmanship, construction or work not in accordance with the design of the product or the construction documents (including but not limited to the drawings and specifications) if such work is performed by [Harris]," Policy, Design/Build Endorsement - Architects and Engineers, Section III(8).  In its complaint against Harris, Delta-T alleges that its damages arise out of manufacturing defects, *see* Delta-T's Complaint ¶¶ 11-16, Delta-T's Counterclaims ¶¶ 33-35, 46-47, *cf.* Section III(j) exclusion, as a result of which Harris' installation "failed to meet the operating conditions and specifications" of the project documents, Delta-T's Complaint ¶ 13, Delta-T's Counterclaims ¶ 35, *see also* Delta-T's Complaint ¶ 11, Delta-T's Counterclaims ¶ 32, *cf.* Section III(8) exclusion.  Delta-T alleges no damages not caused by the alleged manufacturing defects.

Because coverage of Delta-T's claims is clearly excluded under the plain language of the Section III(j) exclusion and Section III(8) exclusion, the Policy provides no coverage for Delta-T's claims.  Because the Policy provides no coverage, James River is under no obligation to undertake Harris' defense.  *See* Policy, Section I(1)(b); Policy, Combined General Endorsement, Section 3.

## CONCLUSION

For the reasons set forth above, Harris' motion (#27) for summary judgment is denied and

/ / /

/ / /

/ / /

/ / /

Page 16 - OPINION AND ORDER

James River's motion (#37) for summary judgment is granted.  Harris' claims against James River are dismissed with prejudice.  A final judgment will be prepared.

Dated this 19th day of July, 2010.

Honorable Paul Papak
United States Magistrate Judge